**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

UNITED STATES OF AMERICA,

Plaintiff,

v.                                                    CRIMINAL NO. 22-213 (ADC)(HRV)

[1] CARLOS MANUEL COTTO-CRUZ,

Defendant.

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

**I.     Introduction**

Defendant Carlos Manuel Cotto-Cruz (hereinafter "Cotto-Cruz" or "defendant") has been charged in a six-count indictment with conspiracy to possess with intent to distribute controlled substances, aiding and abetting others in the possession with intent to distribute controlled substances, and possession of firearms in furtherance of a drug-trafficking crime, all in violation of 21 U.S.C. §§ 841(a)(1), 860 and 18 U.S.C. § 924(c). (Docket No. 3).

Pending before the court is the motion to suppress filed by the defendant on October 30, 2023.  (Docket No. 1391).  The defendant moves to suppress the physical evidence seized from apartment E-301, Mar Building, Hillside Village apartment complex in Rio Grande, Puerto Rico.  He argues that law-enforcement agents unlawfully entered the apartment in violation of his rights under the Fourth Amendment. The

government opposed (Docket No. 1443) and Cotto-Cruz replied. (Docket No. 1467). The matter was referred to me by the presiding District Judge for report and recommendation. (Docket No. 1660). I held an evidentiary hearing on May 22, 2024. (Docket No. 1772). The parties submitted post-hearing memoranda on May 31, 2024. (Docket Nos. 1778, 1780).

For the reasons set forth below, I recommend that the motion to suppress be **GRANTED**.

## II.    Findings of Fact[1]

### A.    Testimony of Cotto-Cruz - Standing

Cotto-Cruz rented Apartment E-301 located at building Mar in the Hillside Village apartment complex, through a third party using the Airbnb online application. Ineyshali[2], an acquaintance, rented the apartment under her name. The length of the rental was from September 2020 until December 2020. He paid approximately $3,000 to $3,200 for the rental in cash. Cotto-Cruz gave the money to Ineyshali, and then he received the keys to the apartment and a beeper to access the apartment complex. During the length of the rental, Cotto-Cruz had control of the keys and the apartment. At the time, Cotto-Cruz had another apartment rented where he would also stay.

---

[1] With the input of the parties, I bifurcated the hearing noting that the defendant had the burden to show that he had a legitimate expectation of privacy in the apartment in question. The defense presented the testimony of Cotto-Cruz.

[2] The correct spelling of the name was not clarified at the hearing. I am somewhat guessing the spelling based on how it sounded phonetically. No last name was provided either.

Building Mar was described as "whiteish" light gray in color. The apartment has parking spaces in front of the building across the street leading to a parking lot. Apartment E-301 had two parking spots next to each other. From the apartment to the parking lot one has to go down the stairs, and through a little "bridge" since the complex is divided into buildings identified with letters, A. B, C, D and so forth. The defense introduced Exhibits A through H, photographs depicting the apartment complex, building E in particular, a far-away view of the hallway leading to apartment E-301, and the parking lot. Exhibits E and E-1 specifically show the parking spots assigned to apartment E-301. Exhibit F depicts at least four parking spots assigned to apartments in building F. These parking spaces are to the far right after the building E spots if one looks from the building to the parking lot.

On cross-examination, Cotto-Cruz stated that he asked Ineyshali to rent the apartment in her name as a favor because she had an Airbnb account. She was the one who gave Cotto-Cruz the keys of the apartment and the beeper. Cotto-Cruz admitted that not putting the rental agreement under his name had to do with the fact that he was a fugitive at the time.

Cotto-Cruz did not know who the actual owner of the apartment was. When asked if he knew whether the owner of the apartment was aware that Cotto-Cruz was staying there, and not Ineyshali, he responded that on one occasion, a man that he described as "American" showed up at the apartment. Cotto-Cruz was not sure if he was the owner or someone in charge of the apartment. The man wanted to make sure he was happy with the property and if everything was ok. For the duration of the lease agreement, no one told Cotto-Cruz that he had to vacate the apartment. Cotto-Cruz did not have to fill out

any paperwork with the security booth.  He admitted that the only evidence of him being authorized to be at the apartment was his testimony and denied that the true purpose of renting the apartment was to store drugs and firearms.

### B.    Testimony of PRPB Agent Miguel Morales-Cotto[3]

Miguel Morales-Cotto (hereinafter "agent Morales-Cotto") has been a Puerto Rico Police Officer for 14 years.  He is currently assigned to the criminal intelligence unit of the Caguas area.  He has served in that unit for 11 years.  His duties include investigating criminal organizations and supporting the homicide and major crimes divisions.

On December 10, 2020, agent Morales-Cotto was working in Caguas at the intelligence division. His involvement in an incident at the Hillside Village apartment complex began a few days prior, on December 8.  That day (December 8), Mr. Lino Acosta ("Acosta") was arrested for being in possession of a vehicle alleged to have a connection with a murder that took place on December 4, 2020, in San Lorenzo, Puerto Rico.  Prior to December 8, 2020, agent Morales-Cruz had not worked with Acosta and Acosta had not provided information to the police or served as an informant.

Following his arrest on December 8, 2020, Acosta made some admissions and spoke about other persons that allegedly participated with him in the December 4, 2020, murder.  Acosta specifically mentioned Cotto-Cruz as being one of the participants in said murder and offered the agents to take them to where Cotto-Cruz was staying.  This

---

[3] Agent Morales-Cotto did not take any notes to memorialize any aspect of his investigation or facts narrated that were the subject of his testimony at the suppression hearing.

information was notified to a supervisor who established a work plan for agents to take Acosta to the area so that he could show them. The plan included the supervisor and another agent to transport Acosta to the area in one car. Agent Morales-Cotto and two other officers went in a separate unmarked vehicle to the Hillside Village in Rio Grande. This happened on December 10, 2020. In addition to the information Acosta provided the police, agent Morales-Cotto knew that there was an outstanding federal arrest warrant for Cotto-Cruz due to a probation violation. Prior to going to Rio Grande for the first time, neither agent Morales-Cotto nor any of his fellow officers called the United States Marshal service.

Once the agents, along with Acosta, reached the area of the Hillside Village apartments, they proceeded to look for a red Ford Raptor. Acosta had informed the agents that Cotto-Cruz drove a Ford Raptor and that if that vehicle was parked there in the parking lot, Cotto-Cruz would be there. Acosta did not provide the police a license plate number of the Ford Raptor and agent Morales-Cotto never saw Cotto-Cruz driving or inside the Ford Raptor. Further, Acosta never provided a specific apartment number where Cotto-Cruz was staying at.

Agent Morales-Cotto accessed the apartment complex by identifying himself as a police officer with the security guard. It was approximately 3:30 p.m. when agents entered the apartment complex. Once inside, he drove his vehicle through the parking lot towards the recreational area. As he did that, the agent was able to observe a red Ford Raptor in the parking lot on the left side. Exhibit 2 is a photograph of the Ford Raptor taken from outside of the apartment complex. As the agent turned the vehicle around in the recreational area, he dropped off one of his fellow officers so that said officer could

check the license plate of the Ford Raptor and to check if the parking space had the apartment number. Then, he drove towards the entrance of the complex to wait for his fellow officer.

While waiting, agent Morales-Cotto observed a gentleman get out of a white Toyota 4Runner. The agent was able to tell that it was Cotto-Cruz because he had previously intervened with him on or around 2018. Cotto-Cruz was by himself in the parking lot. However, citing security concerns given the fact that a fellow officer was walking through the apartment complex, and that Acosta was just outside the complex with another officer, the agents decided not to arrest Cotto-Cruz at that time. Agent Morales-Cotto notified his supervisor and waited for his fellow officer to walk over to the vehicle and board the same to leave. The agents were not able to check the license plate nor verify the apartment number in the parking spot where the Ford Raptor was parked. Again, agent Morales-Cotto asserted that they had to quickly leave the area due to safety concerns. Neither agent Morales-Cotto nor his partner who was sitting with him in the car took a picture or video of Cotto-Cruz.

Agent Morales-Cotto saw Cotto-Cruz enter the building right in front of the parking lot where the Ford Raptor was parked. **He did not see him enter or exiting any specific apartment.** He also admitted that the entrance gives access to "several" apartments, at least eight.

The agents then left the apartment complex. Agent Morales-Cotto communicated to his supervisor that he had learned from an interview of the security guard of the apartment complex that the apartment where Cotto-Cruz was staying at was apartment

E-301.[4]  The supervisor instructed that since they already had the location, they were going to return Acosta to jail so as to not expose him and then go back to the apartment complex to conduct surveillance if necessary, come up with a work plan to investigate further, and arrest Cotto-Cruz.

Agent Morales-Cotto returned to the Hillside Village apartment complex that same day at approximately between 7:15 and 7:30 p.m. to effectuate the arrest. No additional surveillance was to be conducted because the determination was already made that with the information obtained from the investigation, "Cotto-Cruz was at apartment E-301." The operation was to be executed by PRPB's criminal intelligence unit together with U.S. Marshals.  Shortly after arriving to the area and acting upon information provided by Acosta that Cotto-Cruz would have a lookout posted at the entrance of the complex, agent Morales-Cotto observed that there was a Toyota Sequoia parked outside

---

[4] At the hearing, I sustained several hearsay objections by the defense regarding information provided by the security guard of the apartment complex that Cotto-Cruz was staying at apartment E-301.  The government contended that statements by the security guard were not offered for the truth of the matter asserted but rather for the effect on the listener.  Over the defendant's objection, I allowed a statement by the agent to the effect that he learned about the apartment number through the investigation.  Later, on re-direct, the agent testified that it was from his interview of the security guard, he came to the information that Cotto-Cruz was staying at apartment E-301.  This time the defendant did not object.  The objection came once the prosecutor requested specifics as to what was said by the security guard.  I again sustained the hearsay objection.  At the hearing, the government cited *United States v. Bailey*, 270 F.3d 83. 87 (1st Cir. 2001) for the proposition that out-of-court statements offered not for their truth but only "for context, such as the effect of the words spoken on the listener, are not hearsay." However, *Baily* is distinguishable because, here, the statements by the security guard were not offered for the effect on agent Morales-Cotto, but for their truth.  It must be kept in mind that one of the main issues in this case is whether Cotto-Cruz was in fact a resident of apartment E-301.  The only reason that agents went straight to apartment E-301 to execute the arrest of Cotto-Cruz is if the statement by the security guard that he lived there was accepted as true.  The government cannot have it both ways.  It cannot assert that the security guard's statement gave the agents a reasonable belief that Cotto-Cruz lived at apartment E-301 while claiming that any such statement was not offered for its truth. *See United States v. Cabrera-Rivera*, 583 F.3d 26, 34-36 (1st Cir. 2009).

of the complex. Exhibit 1-4 depicts the Sequoia. Without more, the agent proceeded to intervene with the vehicle. Mr. Carlos Santos was detained, and the vehicle was seized. The agent did not see any weapons or drugs, nor anyone committing a crime in connection with the Sequoia. He did not have probable cause to arrest. After the seizure of the Sequoia, Mr. Carlos Santos consented to a search of the same. A pistol, magazines, rounds of ammunition, controlled substances and a radio scanner were seized from the vehicle.

In addition to intervening with the occupant of the Toyota Sequoia, agent Morales-Cotto seized the Ford Raptor that was parked inside the apartment complex. Exhibit 81 is a photograph of the Ford Raptor. A k-9 was passed around the vehicle and marked positive. The vehicle was then sealed and taken to the Caguas precinct. Even though the operation was only to attempt to arrest Cotto-Cruz, the police took a k-9 and passed it around the Ford Raptor. Agents did not seek to obtain a search warrant for the vehicle with the information available, or for the apartment for that matter, while admitting that there were state prosecutors available to assist in applying for search warrants.

The seizure of the Ford Raptor concluded agent Morales-Cotto's participation in the operation that night. Three individuals were arrested. Cotto-Cruz was not one of them.

### C.    Testimony of Deputy United States Marshal Abelardo Conty

Deputy United States Marshal Abelardo Conty-Gonzalez (hereinafter "DUSM Conty") has worked in that capacity for six years. He is formally assigned to court operations but has assisted in other tasks such as cellblock operations, fugitive

operations, and judicial security. Fugitive operations at the marshal service includes investigation, searching for, and apprehending fugitives.

DUSM Conty participated in the fugitive operation of December 10, 2020, seeking to arrest Cotto-Cruz. He was specifically assigned to the tactical entry team. As the tactical team comprised of five not more than six operators approached the door of the apartment, the breacher knocked and announced the presence of law enforcement.  Prior to entry, DUSM Conty heard noises from inside described by him as a "scuffle", "people running", and "loud noises."  Because the priority in conducting entry into a residence is the safety of the officers, a sweep was conducted immediately after entry looking for human bodies.  A sweep looks only into areas where a person could hide.  DUSM Conty could tell that someone had opened the door to, and jumped from, the balcony.  He did not personally see individuals jumping out.

After conducting the security sweep, DUSM Conty observed contraband in plain view.  Specifically, he saw rounds of ammunition, firearms, and what appeared to be controlled substances.  Exhibits 10, 15, 59, 65, 73, 74 and 75 were admitted into evidence depicting some of the items observed by DUSM Coty in plain view. After the security sweep was conducted, the tactical entry team's job is done. The other law enforcement agency that was going to take charge of the scene, in this case Puerto Rico Police, was allowed in.  DUSM Conty saw some people detained outside of the apartment after he was finished with the security sweep. He did not see Cotto-Cruz in the parking lot, exiting the Ford Raptor, entering or leaving the apartment.  Cotto-Cruz was not found inside the apartment either.

### D.    Testimony of PRPB Sergeant Maritere Rivera-Rivera

Sergeant Maritere Rivera-Rivera (hereinafter "Sgt. Rivera") works for the Puerto Rico Police Bureau currently at the Caguas intelligence unit.  She has been a police officer since 2010 and a sergeant since last year. Her duties as agent and supervisor include identifying and investigating criminal organizations.

On December 10, 2020, Sgt. Rivera worked at the same office—Caguas intelligence.  She is familiar with Cotto-Cruz because she had previously seen him on more than two occasions back in 2013 or 2014.  She identified him in open court.  Sgt. Rivera was at the Hillside Village apartment complex in Rio Grande on December 10, 2020.  She was there as part of the team to execute the arrest warrant against Cotto-Cruz. Her role was to provide support and conduct surveillance, if necessary. Sgt. Rivera entered the apartment after the U.S. Marshal team cleared it and informed her that there was evidence observed in plain view that needed to be seized.[5]

Sgt. Rivera entered the apartment together with technical services. She briefly described the layout of the apartment and what she observed as she entered and walked around the apartment.  She saw controlled substances, firearms, rounds of ammunition, and paraphernalia. Exhibits 8 through 83 were admitted into evidence. These are photographs of the contraband as it was found inside apartment E-301.  Sgt. Rivera

_____

[5] Sgt. Rivera testified on cross examination that before "impacting" the apartment, Sgt. Luis Rodriguez told her that Cotto-Cruz had been seen entering and leaving apartment E-301.  This is completely inconsistent with the evidence received at the hearing and raises red flags about the nature of the investigation conducted and the information that was shared with the law-enforcement agents participating in the operative.

10

testified extensively as to what each of the photographs was depicting. She provided details as to whether the images showed the items as they were found or whether she had moved them or manipulated them for purposes of taking the photographs. It became evident that some items found inside closed containers were revealed after Sgt. Rivera removed the lids and opened said containers.

## III.    Applicable Law and Discussion

The defendant contends, first, that he had a legitimate expectation of privacy in apartment E-301. Cotto-Cruz then argues that suppression is warranted because law-enforcement agents had no basis to believe that he resided at apartment E-301 or that he was there at the time they entered the apartment to execute an arrest warrant issued against him.

The government ripostes that suppression of all the contraband observed in plain view at the apartment should be denied because the agents were lawfully present on the premises. According to the government, the information received from the cooperator as well as the investigation conducted was sufficient to establish that the agents had a reasonable belief that Cotto-Cruz lived at apartment E-301 and was home at the time of their entry. Also, in its post-hearing memorandum, the government reiterated what it said at the conclusion of the evidentiary hearing: that items found in containers with close lids that were opened by the police should be excluded. The government referred to an attachment listing said items and the corresponding exhibit number. However, no attachment was included. It does not matter since I am recommending suppression of all the evidence seized from the apartment. *United States v. Graham*, 553 F.3d 6, 12 (1st

Cir. 2009)(holding that if the initial entry is "unjustified the evidence discovered subsequent to it must be suppressed.").

### A.    Defendant's Expectation of privacy in apartment E-301

When moving to suppress evidence, a defendant "carries the burden of establishing that he had a reasonable expectation of privacy with respect to the area searched or . . . the items seized." *United States v. Lipscomb*, 539 F.3d 32, 35-36 (1st Cir. 2008)(*citing United States v. Salvucci*, 448 U.S. 83, 91-92, 100 S. Ct. 2547, 65 L. Ed. 2d 619 (1980)).  This threshold standing requirement is something that a defendant must establish before the court engages in any substantive Fourth Amendment analysis. *United States v. Lewis*, 40 F.3d 1325, 1333 (1st Cir. 1994).  To carry this burden,

> a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable; i.e., one that has a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society.

*United States v. Samboy*, 433 F.3d 154, 161 (1st Cir. 2005)(*quoting Minnesota v. Carter*, 525 U.S. 83, 88. 119 S. Ct. 469, 142 L. Ed. 2d 373 (1998)).  Put differently, the court must determine "whether or not the individual thought of the place (or the article) as a private one, and treated it as such" and "whether the individual's expectation of confidentiality was justifiable under the circumstances." *United States v. Aguirre*, 839 F.3d 854, 857 (1st Cir. 1988). The following factors are relevant: "ownership, possession, and/or control; historical use of the property searched or the thing seized; ability to regulate access; [and] the totality of the surrounding circumstances." *Id*. at 856-57.

I find that Cotto-Cruz submitted sufficient evidence to meet his burden of showing a legitimate expectation of privacy in apartment E-301. He testified he asked an acquaintance to rent the apartment as a favor using the Airbnb application. Cotto-Cruz gave Ineyshali cash to pay for the rental, and she rented the apartment under her name. Once rented, Cotto-Cruz received the keys and a beeper. He had control of the keys and the beeper. When shown pictures, he could identify the layout of the apartment complex and apartment E-301, thus showing familiarity. Even though he stayed at other places during this time due to his fugitive status, Cotto-Cruz had control over and stayed at the apartment for approximately three months. Cotto-Cruz himself had an interaction with a person he identified as either the owner or person in charge of the apartment. That person never asked Cotto-Cruz to vacate the premises presumably knowing that the apartment had been rented under the name of a female.

In *Minnesota v. Olson*, 495 U.S. 91, 110 S. Ct. 1684, 109 L. Ed. 2d 85 (1990), the Supreme Court held that a defendant wanted in connection with a murder had a reasonable expectation of privacy in the house where he was hiding because he was an overnight guess. "It is not necessary that the defendant own the home or be a signatory on a lease or rental agreement; even an overnight guest can have a Fourth Amendment right when he resides at a home 'with the permission of his host, who is willing to share his house and his privacy with his guest.'" *United States v. Ray*, 541 F. Supp. 3d 355, 380 (S.D.N.Y. 2021)(*quoting Minnesota v. Olson*, 495 U.S. at 99); *see also United States v. Torres-Viruet*, 330 F. Supp. 3d 708, 717 (D.P.R. 2018)(Delgado-Colon, J).

In any event, the government did not to address the sufficiency of the evidence regarding standing in its post-hearing memorandum focusing only on the merits of its

argument regarding the lawfulness of the warrantless entry. By doing so, the government has abandoned its claim that Cotto-Cruz lacks standing.  Even if the claim had not been abandoned, for the reasons outlined above, I would still conclude that the defendant has carried his burden to show he has standing. Moreover, under a very similar factual scenario, a magistrate judge of this district has recommended that Cotto-Cruz be found to have a reasonable expectation of privacy in a residence where he was staying notwithstanding his fugitive status, the contraband discovered, and the rental agreement being under the name of a third person.  *See United States v. Cotto-Cruz*, Criminal No. 21-320 (ADC/BJM), 2023 WL 4247503, 2023 U.S. Dist. LEXIS 113752 (D.P.R. June 29, 2023).  I likewise recommend that Cotto-Cruz be found to have standing to challenge the lawfulness of the entry into apartment E-301.

## B.    Warrantless entry into the apartment

The Fourth Amendment protects against unreasonable searches and seizures.  U.S. Const. amend IV.  "It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586, 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980). And "[o]n a motion to suppress evidence seized based on a warrantless search, the presumption favors the defendant, and it is the government's burden to demonstrate the legitimacy of the search." *United States v. Delgado-Perez*, 867 F.3d 244, 250 (1st Cir. 2017)(*quoting United States v. Winston*, 444 F.3d 115, 123-24 (1st Cir. 2006)).

Relevantly, it has been held that police officers attempting to execute an arrest warrant have "limited authority to enter a dwelling in which the suspect lives when there is reason to believe that the suspect is within." *Payton v. New York*, 445 U.S. at 603.

14

Even if the officers are mistaken as to the subject's residence, "no Fourth Amendment violation occurs if the officers enter a third party's home under the reasonable belief that the target named in the arrest warrant **resides** at the dwelling in question and **will be present** at the time of entry." *Solis-Alarcon v. United States*, 662 F.3d 577, 580 (1st Cir. 2011)(*citing United States v. Werra*, 638 F.3d 326, 336-37 (1st Cir. 2011) and *United States v. Graham*, 553 F.3d at 12-13)(emphasis ours).

The First Circuit has not explicitly decided whether the standard to be applied is probable cause or reasonable belief. *United States v. Young*, 835 F.3d 13, 19 n.6 (1st Cir. 2016)(*quoting United States v. Werra*, 638 F.3d at 337)(noting that the First Circuit has implicitly accepted the majority view adopting the reasonable belief standard and treating it as less stringent than probable cause.); *see also United States v. Hamilton*, 819 F.3d 503, 506 n. 5 (1st Cir. 2016). I must therefore look to other circuits for a definition of the reasonable belief standard. "[R]easonable belief is not a finely-tuned standard" but "can only be ascertained through a weighing of the facts in the record, as it is a fluid concept that takes its substantive content from the particular contexts in which the standard is being assessed." *United States v. Thomas*, 429 F.3d 282, 286, 368 U.S. App. D.C. 285 (D.C. Cir. 2005)(*quoting Illinois v. Gates*, 462 U.S. 213, 232, 103 S. Ct. 2317, 76 L. Ed. 2d 257 (1983)). While the degree of certainty required for reasonable belief cannot be defined with precision, some guidance could be obtained from case law holding that the standard "requires more than a hunch as to presence, but less than a probability." *United States v. Bohannon*, 824 F.3d 242, 255 (2d Cir. 2016). To satisfy this standard, the officers need only "have a basis for a reasonable belief as to the

operative facts, not that they acquire all available information or that those facts exist." *United States v. Lovelock*, 170 F.3d 339, 344 (2d Cir. 1999).

Against this backdrop, I tackle the controversy at hand. I must determine whether the police had a reasonable belief, as defined above, that Cotto-Cruz (1) resided at apartment E-301, Hillside Village in Rio Grande, and (2) was there on December 10, 2020, at approximately 7:15 p.m. After careful consideration of the evidence presented at the suppression hearing and the applicable law, I must conclude that the government has failed on both prongs of the inquiry.

### 1.    Residence

At the outset, it is undisputed that there was an outstanding arrest warrant against Cotto-Cruz for violation of supervised release and that he had been a fugitive for quite some time.[6] Through the testimony of the government's only witness linking Cotto-Cruz to the apartment—agent Morales-Cotto—it was established that the police acted upon the following information when they forced their entry into apartment E-301.

On December 8, 2020, Acosta was arrested for his alleged connection to a murder that occurred in San Lorenzo four days earlier. Acosta apparently provided post-arrest statements that incriminated himself and others, including Cotto-Cruz, in the San Lorenzo murder. He agreed to cooperate with the authorities and offered to take the

---

[6] I take judicial notice of Criminal No. 15-244 (ADC). From the docket of that case, it is apparent that the arrest warrant against Cotto-Cruz was issued on April 5, 2019. Criminal No. 15-244 (ADC), Docket No. 232. Thus, at the time of the events in this case, Cotto-Cruz had been at large for more than 20 months.

agents to where Cotto-Cruz was "staying." Note that Acosta did not offer to take the agents to the "residence" or "home" of Cotto-Cruz. Agent Morales-Cotto was not present during the time Acosta provided these statements. They were relayed to him by others.

A work plan was established to go to the place where Acosta said Cotto-Cruz was staying. The plan included transporting Acosta to the area; said plan was executed on December 10, 2020, in the afternoon hours. At approximately 3 p.m., Acosta directed the agents to the Hillside Village apartments and the only other information provided, at least as per the testimony presented at the hearing, was that Cotto-Cruz drove a red Ford Raptor. Acosta told the agents to look for the Ford Raptor because if it was parked at the apartment complex, Cotto-Cruz "would be there." That is the extent of the information provided by Acosta, a murder suspect turned cooperator, that had not previously provided information to the agents. No evidence was ever introduced as to the basis for Acosta's knowledge about the location of Cotto-Cruz. And, importantly, there was no evidence presented that Acosta provided a specific apartment number to the agents.[7] *Cf. United States v. Gay*, 240 F.3d 1222, 1227 (10th Cir. 2001)(finding objective reasonable belief where informant knew target was involved in criminal activity, told the officers location based on personal knowledge, accompanied officers to the residence and pointed at the dwelling).

---

[7] The government represented in its opposition to the defendant's motion to suppress that "a witness came forward" and identified the location including "Apartment E-301." (Docket No. 1443 at 3). Unless the government was referring to a different witness than Acosta, the evidence at the hearing did not support this factual representation.

Three agents, including Morales-Cotto, entered the apartment complex in an unmarked vehicle. Acosta remained outside of the apartment complex accompanied by two additional police officers. A red Ford Raptor was parked in the parking lot of the apartment complex. But agent Morales-Cotto did not have at that time any information connecting Cotto-Cruz to the Ford Raptor aside from Acosta's statement. An unidentified agent was dropped off to attempt to get the license plate of the Raptor and to attempt to see the apartment number of the spot in which it was parked. Neither of these tasks were successful because suddenly there was a Cotto-Cruz sighting. According to agent Morales-Cotto, he saw Cotto-Cruz step out of a white Toyota 4Runner. Agent Morales-Cotto alleges to have intervened with Cotto-Cruz back in 2018 (although he was a bit equivocal about the year); that is how he was able to identify the defendant. Cotto-Cruz was by himself and not armed. No information was provided as to what happened with the white 4Runner after Cotto-Cruz stepped out of it. I must note that assuming agent Morales-Cotto did in fact see Cotto-Cruz, then the information provided by Acosta suggesting that if the Raptor[8] was parked there, Cotto-Cruz "would be there", turned out to be wrong as he was seen arriving in a different vehicle.

The agents were then instructed to retreat because of security concerns since they had Acosta outside. Aside from the alleged security concerns, there appeared to be nothing impeding the agents from attempting to arrest Cotto-Cruz. I am unable to

---

[8] The government similarly represented in its opposition that within a few minutes of seeing Cotto-Cruz, the Ford Raptor was observed leaving the apartment complex. (Docket No. 1443 at 4). This is not what the evidence showed at the suppression hearing. There was no mention by agent Morales-Cotto, or anyone else, of the Raptor leaving the Hillside Village apartment complex at that time.

understand how an apprehension attempt by three armed agents against an unarmed target, compromised the safety of a cooperator sitting in a vehicle outside of the complex and under the custody of other law enforcement agents. In any case, this is not dispositive here because my job is to assess the lawfulness of the entry.

None of the agents were able to snap a picture or video of Cotto-Cruz claiming that they did not want to alert defendant of their presence. The mission to get the license number of the Raptor as well as the parking spot number had to be aborted. While waiting for his partner to board the vehicle, Agent Morales-Cotto was somehow able to see Cotto-Cruz access the entryway of building E. He did not see Cotto-Cruz enter (or leave) any of the at least 8 apartments in that building.

Notwithstanding the cited security concerns and the need not to alert Cotto-Cruz of their presence, agent Morales-Cruz had a sufficient opportunity to interview the security guard. It was the security guard who told the agents that Cotto-Cruz was staying at apartment E-301. There was no further surveillance or investigation conducted to corroborate that Cotto-Cruz actually lived at Apartment E-301. With the scant information gathered, the police decided that they had all they needed to go back to the apartment complex and enter apartment E-301. Over four hours elapsed between the first visit to the Hillside Village and the time agents entered the apartment. There was no explanation provided as to why more surveillance could not be conducted to further corroborate the information, nor why a search warrant could not be obtained during that time.

I understand that there was a sense of urgency to arrest a fugitive presumed to be armed and dangerous. However, two days elapsed between the time Acosta provided

post-arrest statements and the time the agents got around to go to the area. There was no evidence presented that the agents did anything during those two days to conduct surveillance or corroborate the information. It is worth noting again that all Acosta provided was a statement that Cotto-Cruz was staying at Hillside Village (no apartment number), that he drove a red Ford Raptor, and that if the Raptor was parked at the apartment complex, Cotto-Cruz would be there. Granted, there was a red Ford Raptor parked at the apartment complex. In that sense, I find that there was some corroboration of Acosta's statements. But then he went 0 for 2 with respect to Cotto-Cruz "driving" the Ford Raptor and being there "if the Raptor was there."

Now, I am mindful that I did not allow evidence of details provided by the security guard that would have tended to further corroborate Acosta's information. The record only contains a statement by agent Morales-Cotto that upon interviewing him, the security guard supplied the apartment number where Cotto-Cruz was staying. Again, the basis of such knowledge is unclear because I prevented the government from bringing in this information through unreliable hearsay. Specifics such as how did the security guard identified Cotto-Cruz as the current resident of E-301 or as driver of the Raptor did not make it into the record. The unreliability of this evidence was further highlighted by the fact that agent Morales-Cotto did not document the interview and only vaguely stated that he had written down the identity of the security guard somewhere but could not recall his name or identifying information. Thus, the government's description in its post-hearing brief of the security guard as a reliable source is incorrect. Moreover, I was not made aware of any reason why the security guard could not be called as a witness.

In view of the above, I find that the evidence was insufficient to establish a reasonable belief that Cotto-Cruz was a resident of apartment E-301. At most, putting together the information provided by Acosta and the fact that the agent saw Cotto-Cruz at the apartment complex entering building E, the government has established that agents had a reasonable belief that he resided in one of the at least 8 apartments in that building. I recognize that this is a close question because (1) the reasonable belief standard is relatively low and (2) the apartment number learned through "the investigation" could have provided the necessary level of belief that the defendant resided at the apartment at issue. *See Graham*, 553 F.3d at 13 (the police need not posses rock-solid indicators of residence). Nevertheless, I reiterate my finding because in this case, the quantity and quality of the evidence required that the officers did more to corroborate. *United States v. Brinkley*, 980 F.3d 377, 386 (4th Cir. 2020)("The quantity and quality of information known to officers bear on whether they have [reasonable belief], with less reliable information requiring more corroboration.") Here, the information about residence was sparse (Acosta and a few minutes investigation at the scene), and unreliable (hearsay from the security guard).

## 2.    *Presence*

Even if the evidence was sufficient to hold that the agents reasonably believed that Cotto-Cruz resided at apartment E-301, the evidence falls short of establishing they had a reasonable belief that he was there at the time they entered the apartment. First, the only evidence tending to corroborate Cotto-Cruz' presence is information linking the Ford Raptor to him. *See Werra*, 638 F.3d at 339 (*citing Valdez v. McPheters*, 172 F.3d 1220, 1226 (10th Cir. 1999)(the presence of a car associated with the suspect is a type of

circumstantial evidence that suggests the individual named in the arrest warrant is present.). But the brief investigation conducted by the agents revealed nothing that could lead me to conclude that the vehicle was owned or used by Cotto-Cruz. Other than Acosta's uncorroborated statement, there was no admissible evidence presented to show a connection between the defendant and the Raptor.

Second, if in fact agent Morales-Cotto saw Cotto-Cruz in a different vehicle, as was his testimony, then Acosta was wrong when he stated that if the Ford Raptor was parked at the apartment complex, Cotto-Cruz would be there. Therefore, observing the Ford Raptor parked at the apartment complex when the agents returned the night of December 10, 2020, cannot serve as a basis for establishing a reasonable belief of presence. My finding is further confirmed by the fact—although I realize this is post-hoc rationalization—that upon entry, Cotto-Cruz was not found at the apartment even though the Ford Raptor was there.

And here, similar to *Young* and *Werra*, the police made no efforts to confirm the defendant's presence at the apartment before entering. *Young*, 835 F.3d at 23; *Werra*, 638 F.3d at 338. There was nothing preventing the agents from conducting additional surveillance or employing other investigative techniques to confirm presence. While the question of residence is a close one, the issue of presence in my opinion, is not close at all. Suppression is warranted.

## IV.  Conclusion

In the haste for apprehending a fugitive believed to be armed and dangerous, the police exhibited a level of corner cutting that I cannot simply overlook. "Because the prophylaxis of the Fourth Amendment protections is at its zenith with respect to an

22

individual's home, a warrantless search of a private residence is presumptively unreasonable unless one of a few well-delineated exceptions apply." *United States v. Infante*, 701 F.3d 386, 392 (1st Cir. 2012). The government has failed to overcome said presumption in this case. Accordingly, I recommend that the motion to suppress at Docket No. 1391 be **GRANTED**.[9]

This report and recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B) and Rule 72(d) of the Local Rules of this Court. Any objections[10] to the same must be specific and must be filed with the Clerk of Court **within 14 days**. Failure to file timely and specific objections to the report and recommendation is a waiver of the right to appellate review. *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Davet v. Maccorone*, 973 F.2d 22, 30–31 (1st Cir. 1992); *Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988); *Borden v. Sec'y of Health & Human Servs.*, 836 F.2d 4, 6 (1st Cir. 1987).

**IT IS SO RECOMMENDED.**

In San Juan, Puerto Rico this 17th day of June, 2024.

S/Héctor L. Ramos-Vega
HÉCTOR L. RAMOS-VEGA
UNITED STATES MAGISTRATE JUDGE

---

[9] I certainly expect the government will object to my recommendation. In so doing, the government is ordered to list of items seized from the apartment it has indicated would not be used as part of its case in chief. The presiding District Judge should have the benefit of said list in case she was inclined to reject my recommendation.